WILLIAM D. LOWERY AND E. F. LOWERY v. WILLIAM C. LOWERY AND SARAH A. LOWERY, Appellants, *et al.*

**Statute of Frauds:** NO AVOIDANCE OF ESTABLISHED.    Defendant and his mother orally agreed that she would convey to him, as a full advancement from his parents estate, a farm which he and his brother occupied as tenants, living thereon in separate houses.    He was to give her a ten year mortgage thereon for

$5,000, without interest. He also claimed she was to give him. $1,000 as a part of the same deal, and he did cash a certificate of deposit of $300, which belonged to her. Defendant drew a deed and sent it to her to execute, and a mortgage which he promised to execute on receipt of the deed. His father then wrote defendant that he had imposed on his mother, and was attempting to get more than his share of their estates, and offered to make an equitable division of their property. Defendant then wrote his mother accusing her of backing out, and insisting on her executing the deed. She replied, referring him to his father, and promising to do what they agreed was right. The deed was not executed, and no further agreement was made. The brother moved off his farm, and defendant moved to the house his brother had occupied, and thereafter controlled the whole farm. Code, section 4626, excepts from the statute of frauds, relating to oral argeements to convey land, cases where a portion of the purchase money has been paid, or the vendee, with the consent of the vendor, has taken and held possession by virtue of the contract; or where there is any other circumstance which by the law theretofore in force would take the case out of the statute. *Held*, that there was no part performance of such oral contract, or other circumstances to take the case out of the statute of frauds.

**Evidence:** PERSONAL TRANSACTION WITH DECEDENT. Where, in an action between the heirs of a decedent to partition certain real estate, one of them claims to own the whole under a gift from the deceased, he is incompetent to testify to any personal transactions or communications had between him and deceased, under Code, section 4604, providing that no party, or person interested shall be examined as a witness in such regard, against deceased's heir at law, etc.

*Appeal from Mahaska District Court.*—HON. W. G. CLEMENTS, Judge.

THURSDAY, APRIL 10, 1902.

LYDIA A. Lowery died March 4, 1898. The plaintiffs, William D. Lowery, her surviving husband, and E. F. Lowery, a son, alleged that she at that time was seized of two farms in Mahaska county, one of 424 acres, and the other of 243 acres; that the interest of the husband therein

is one-third, and that of the son named and each of the defendants, save Sarah A., who is the wife of William C. Lowery, being children of deceased, is two-fifteenths; and they ask that the land be partitioned accordingly. William C. Lowery, his wife joining, by way of answer and cross petition, denied that his mother died seized of the 424-acre farm, and averred that in January, 1893, the deceased "did, by gift, then and there verbally make, transfer, and convey unto" him said land, upon condition that he should pay her the sum of $5,000 upon April 1, 1893, without interest, to be secured by mortgage thereon, said gift to be accepted in full of his share in the estate of the father and mother, and that he accepted said gift on the terms stated, and went into possession in pursuance thereof. All of this was denied by plaintiffs and the other defendants. On hearing, the cross petition was dismissed, and partition decreed as prayed. William C. and Sarah A. Lowery appeal.

*Bolton, McCoy & Bolton* and *B. W. Preston* for appellants.

*L. C. Blanchard* for appellees.

LADD, C. J.—The only controverted issue in this case is whether William C. Lowery became owner of the farm of 424 acres under a contract with or gift from his mother, Lydia A. Lowery, in January, 1893. As she was dead at the time of his examination as a witness, he was not competent to testify to any personal transaction or communication had between him and her. Code, section 4604. Not a circumstance in the entire record obviates the rule excluding such testimony, and it must be disregarded. It should have been omitted from the abstract and not resorted to in argument.

II. For the purposes of this case it may be conceded that William C. Lowery had an oral understanding or

agreement with his mother, Lydia A. Lowery, about January 10, 1893, by the terms of which she was to convey to him the farm on the conditions stated in the deed forwarded by him to her for execution. Eliminating so much of his testimony as was inadmissible, and treating her correspondence, in which the correctness of the stipulation therein contained was not questioned, as in the nature of an admission of its accuracy, this conclusion may be reached, and is the most favorable for William possible from this record. The stipulation reads: "This conveyance is intended as an advancement unto said Wm. C. Lowery, who is the son of said Lydia A. Lowery and Wm. D. Lowery, and is intended as an advancement in full of his distributive share of the estate of both his father and mother, and is accepted by said grantee in full of his share in either of said estates, more or less. Said Wm. C. Lowery has executed his mortgage to Lydia A. Lowery for $5,000, which he is to pay, the advancement being the residue of the purchase money after deducting said mortgage." Evidently the proposed conveyance was intended for a gift. The land, as appears from the subsequent correspondence, was more than intended for one son, and this accounts for the mortgage, covering the excess in value above the gratuity. If a gift, it was never completed by the execution of the deed, and nothing done by Lydia A. Lowrey indicated a purpose on her part to transfer possession or control of the farm in pursuance of the understanding mentioned. But it is immaterial whether the alleged agreement be treated as a contract of sale, or as a gift, or both, as in any event it was repudiated by deceased before anything binding was done by either party in carrying it out. Being in parol, and having for its object the transfer and creation of an interest in land, it was within the statute of frauds, unless taken out under the exceptions noted in section 4626 of the Code: "Where the purchase money or any portion thereof, has been received by the vendor, or

when the vendee, with the actual or implied consent of the
vendor, has taken and held possession thereof under and
by virtue of the contract, or when there is any other cir-
cumstance which by the law heretofore in force, would
have taken the case out of the statute of frauds." It is
not pretended that anything was paid by him or to be paid,
aside from the mortgage. True, at about that time a cer-
tificate of deposit for $300 in an Ohio bank was indorsed
by the mother to William, and he drew the money thereon.
There is no competent evidence as to how he came to ac-
quire it; but, even if we were to concede that it was a part
of $1,000 she was to give him on the land deal, this
would not bring the arrangement within the exception of
the statute, as, to accomplish that, the payment must have
been to the vendor. Nor was it a circumstance which
would relieve from the operation of the statute under the
last clause, for at common law payment by either party
did not have that effect. But it is said that William C.
went into possession in pursuance of the alleged agree-
ment. To be effective, in taking the case out of the statute
of frauds, this must have been with the actual or implied
consent of his mother. He and his brother Esbon had been
farming the place for several years as tenants. At the
time in question Esbon had moved away. There were two
dwellings on the land, and the only change in occupancy
was the removal of William from the house occupied by
him to that vacated by Esbon the last day of February or
the first day of March, 1893, and thereafter controlling the
entire farm. Though he, as well as his family, had visited
in Ohio for several months previous, his personal effects
and stock had remained on the premises during his absence,
and from his return, January 16, 1893, to the date above
mentioned, no change whatever had taken place. Conced-
ing, then, without deciding, that transfer to another house
and assumption of control of the entire farm, instead of
part of it, was a sufficient taking of possession under the

statute quoted, was it by his mother's consent "by virtue
of the contract?" It was not, as he well knew at the time.
He had driven a hard bargain with his mother, and, evi-
dently at the first opportunity after learning of its terms,
January 19, 1893, his father wrote: "The contract you at-
tempted to make with your mother will have to be remod-
eled before it can be placed on paper, from the fact that
she failed to take her lawful interest out of the estate first.
I will make you a statement that we think is about right."
Then follows an estimate of the value of the property of
himself and wife at $30,850, and the conclusion that,
whereas there were five children, the share of William C.
should have been $4,113, and ending: "You see that the
½ of 424 will come to $2,247 more than one share. We can
make you a good title for ½ of 424 acres." To this William
responded January 30th by calling for explanation of the
meaning of the letter, and asserted that the "contract you
speak of being attempted was not only attempted, but was
completed," and asked whether the statement "was gotten
up by all of you, or is it one of your individual getups?"
The father answered that his computation had been sub-
mitted to his wife and children, and all concurred in it,
and continued, "We would like you to have an equal share
of the estate, and we cannot see why you should ask for
more. We think we had better make two dividends, the
first to correspond to the fifth share as near as we make it
out. The last one can be made out of the residue that
may be left when we are done with it." In response to
this February 11th, by computation, William attempted to
show that if the agreement should be carried out he would
get but $92 in excess of one-fifth of the entire property his
parents then had, and closed by saying, "I will send the
papers to you folks as per contract, and intend to proceed
to business in a business manner." On February 15th,
another son, Tindal, wrote, in behalf of his mother, to Wil-
liam,: "She says you should have consulted your father

about it when you come to take your share of the whole
estate; that she could not make it satisfactory without his
consent, and it would not stand in law unless he consented
to it.   Now, as father has written to you what he will do,
mother is willing for you and him to fix it up whatever
way you and he can fix it so both of you will be satisfied."
William C. recognized this as being from his mother, and
on February 22d answered: "I traded with you, and it
was your place to consult father with regard to the trade,
and not mine;   and more than that I consider it nothing
less than an insult for you to write such a statement as
that after putting off trying to make arrangements here
till the very last hour had come to do it in; and more than
that, it looks very much like some one (and I don't care .
who it was) has got their back up about something since I
left Ohio, and you are trying to get up some kind of an ar-
rangement and saddle the blame on some one else, and by
so doing you think you will t y and squirm out of what
you agreed to do.   You remember you told me that when
you agreed to do anything that that would be just what
you would do.   Now, if you consider your word worth any-
thing, I think it would be policy for you to do just what
you agreed to do without any more hum hawing about it;
and if father is not going to sign the deed according to
contract, let him come out here and stay this spring, and
see things for himself, and not be banging away about
something he does not know anything about; but him not
signing the deed is not going to hinder you in the least
from doing what you agreed to, for the mortgage business
will counteract anything that he may attempt to do in the
future, and there will be no one else that can cause trouble
except him himself; and if you live as long as he does he
cannot cause any trouble whatever.   Now I expect you to
sign this deed according to agreement without any more
squirming about it."   The next day he inclosed to his
mother the deed to the land, containing the stipulation

quoted, which he requested be signed and acknowledged before a proper officer, and a mortgage he proposed to execute upon its receipt.   In response to this, February 27, 1893, William D. Lowery, after acknowledging the receipt of the last two letters and papers, and saying, among other things, "You know from my former statements what we are willing to do," in postscript added: "In your letter of the 23rd inst. you charge your mother of trying to get out of her contract which agreed to.   I will state to you how that contract was made, as your mother states it to me. You stated to her that she could give you your full share out of her own property if she seen fit to.   Now, you deceived your mother by making that false statement, and that with a number of things that you said were by you brought to bear on her mind were the means by which you got her to consent to the contract that you are making so many grave charges about, and now you state the mortgage will counteract anything that I may attempt to do.   By fraud you got the contract, and now you want her to sign a lot of papers to fasten her to a contract that you got of her by fraud."   No question is made but that Tindal Lowery acted for his mother in writing the letter of February 15th, and William treated it as coming from her.   Therein he was informed the whole matter had been turned over to her husband, to be fixed up as best could be done.   These letters disclosed the parents' intention not to complete the proposed gift or contract before anything was done by way of executing it, and of this fact William was fully advised before his removal from one house to the other.   His mother had the perfect right to reconsider the proposition. or agreement to give the land to him at any time before this was actually done.   She did so, and that ended all legitimate claim he could possibly have to it.   As he was informed before altering his situation in any way that she had renounced the oral arrangement between them, it is needless to say that the taking of possession thereafter, if

this was done, was not only without her consent, but if, as claimed, "by virtue of the contract," then in spite of her objections.   In the correspondence this son seems to have ignored the fact that he had no legal claim to the property of either of his parents, and that whatever was proposed was in the nature of a gratuity.   In addition to insisting, according to his own computation, on $92 more than one-fifth of all the property they then had, he proposed to have $5,000 of the remainder 10 years without compensation for its use.   Every letter written by his father or mother indi ates their purpose and readiness to deal with him on the basis of equality with the other four children.   Every letter written by him breathes the spirit of unutterable selfishness and greed.   It is said he has been in possession many years and made improvements.   If so this happened notwithstanding the repeated assertions of his mother that he could not have the farm, and allowed, doubtless, rather than incur the litigation which he continually threatened; for to her affectionate communications, abounding in scriptural quotations and references, he responded only in threats and abuse, demonstating his utter indifference to the sacred admonition, "Honor thy father and thy mother." His demands are without equity, and the decree is AFFIRMED.